**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

———————————————————

RAMADA WORLDWIDE, INC.,

       *Plaintiff*,

      v.

                        Civil Action No. 08-3845 (KSH)

HOTEL OF GRAYLING, INC., RALPH
AYAR, ZUHAIR AYAR,               **OPINION**

       *Defendants.*

_____

**<u>Katharine S. Hayden, U.S.D.J.</u>**

    **I.**      **Introduction**

    Plaintiff Ramada Worldwide Inc. ("RWI") has moved for summary judgment [D.E. 31] on Counts I, II, and VI of the complaint it filed against Hotel of Grayling, Inc. ("Grayling"), Ralph Ayar and Zuhair Ayar (collectively, "defendants") [D.E. 1] and on each of the counts brought by defendants in their counterclaim [D.E. 13]. This diversity action pertains to a contract dispute arising out of the franchise agreement executed by Grayling and RWI, and the related guaranty entered into by the Ayars.

    **II.**     **Background Information**

    The subject of this dispute is the guest lodging facility located at 2650 I-75 Business Loop in Grayling, Michigan ("Facility"), which defendants Ralph and Zuhair Ayar purchased in May 1997. (*See* Affidavit of Valerie Capers Workman ("Workman Aff."), Exh. A.) When the

1

Ayars first purchased the Facility, it operated as a Holiday Inn and continued as such until 2007 when its franchise contract with Holiday Inn expired.  (Deposition of Ralph Ayar ("Ayar Dep."), 23:9-24.)  During that time, and since, Ralph worked as the hotel's vice-president and his brother Zuhair served as the president.  (*Id.* 34:15-20.)  The general manager was Dean Smith, who has worked at the Facility in some capacity since 1983.

### a.  Negotiations

According to Ralph Ayar's deposition testimony, sometime around April 2007, representatives from RWI approached him in an effort to persuade him to convert the Facility to a Ramada franchise.  (*Id.* 24:4-23.)  RWI does not own or operate hotels.  Instead, it employs a guest-lodging facility franchise system comprised of federally-registered trade names and logos, which it allows franchisees, pursuant to individual license agreements, to use in branding their hotels as a Ramada franchise.  (*See* Workman Aff. ¶¶ 5-6.)  Dean Smith testified that Brian Waalkes, a representative from RWI, Ralph Ayar and himself met three times to negotiate the terms of a potential franchise agreement.  (Deposition of Dean Smith ("Smith Dep."), 15:8-24.)  According to Smith, during negotiations with RWI, he and Ayar expressed their concerns about a potential transition from a Holiday Inn franchise.  (*Id.* 17:3-9.)  Some of these concerns, he stated, "had to do with signage, with reservation system, with training, with the things that are required for the daily operation of the hotel."  (*Id.* 17:3-8.)

At the third meeting, on May 9, 2007, RWI and Grayling executed an agreement regarding the operation of the 147-room Facility. (*See* Workman Aff. Exh. A, hereinafter, "License Agreement.")  At his deposition, Ralph Ayar testified that he did not have an attorney present at the meeting and that he did not read the License Agreement prior to signing it.  (Ayar Dep. 35:13-15, 36:8-20.)  On the same day, Ralph and Zuhair Ayar entered into an agreement

with RWI, whereby they would be individually responsible for any default Grayling had on the License Agreement.  (*See* Workman Aff. Exh. B, hereinafter, "Guaranty".)

**b.  Terms of the License Agreement**

The License Agreement details the terms of the franchise contract between RWI and Grayling.  The provisions in the contract relevant to the instant dispute are as follows:

Section 7.1 requires that Grayling pay monthly fees to maintain the rights of a Ramada franchise.  These fees, hereinafter referred to as "Recurring Fees," as they were termed in the License Agreement, "are payable fifteen days after the month in which they accrue, without billing or demand."  Section 7.1 also provides that the Recurring Fees are comprised of Royalty and RINA Services Assessment Fees.  Subsection 7.1.1 defines a "'Royalty' [as] equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, [which] accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term."  Subsection 7.1.2 defines the "RINA Services Assessment Fee" as a fee for the "advertising, marketing, training, the Reservation System and other related services and programs, [which] accrues from the Opening Date until the end of the Term."

Section 3.6 requires Grayling to purchase computer hardware and software.  It states, "You will obtain and maintain the computer and computer services and equipment we specify to participate in the reservations system."  Section 13 states, in relevant part, "In order to accelerate connectivity to the central reservations system, we may, at our option, install a property reservation manager system ("PRM") on a temporary basis for accessing the central reservation system through the internet."

Section 3.8, entitled "Financial Books & Records; Audits," provides in subsection 3.8.2, "Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement. . . ."  Further, in § 3.8.3, it states that RWI "will notify you in writing if you default under this Agreement."

The provisions in § 4 of the contract impose service obligations on RWI.  Subsection 4.2 obligates RWI to

> Operate and maintain . . . a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. . . .  We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate.  The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term.

Subsections 4.1 and 4.6 pertain to RWI's obligation to provide training to Grayling employees.  Section 14.1 provides, "You will be entitled to possession of the location and the facility during the entire term without restrictions that would interfere with your performance under this agreement."

With respect to terms and conditions *not* included in the License Agreement, § 17.7.2 provides in bold print: "Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement."  Finally, in § 17.7.3, the License Agreement provides:  "This Agreement, together with the exhibits and schedules

4

attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License."

### c.  Transition of a Ramada Inn

According to defendants' version of events, the transition to a Ramada franchise was rife with problems.  First, when the License Agreement was executed, the Facility was slated to open for business as a Ramada on June 1, 2007; however, the transfer date was delayed. As Smith testified:

> When we signed [the License Agreement] originally, we were set for a date in June, I believe, to – to switch to Ramada. . . . We cannot operate with a hole in our sign.  I mean, we have a 20, 30 foot tall sign, and we need the name there.  And at the time, they said we need to get this ball rolling.  We'll get in touch with our vendor.  As I understand it, [RWI] has a preferred vendor, if you will, for signage, the only one they work with.  They said they would contact them and make the arrangements to have the contract sent to us . . . but the discussion . . . was that sometime after this license agreement was signed . . . we could not get the sign installed that first part of June.  They couldn't get paperwork ready in time. . . . And Ralph and I discussed it and said we need to wait a month then. . . .  We went to Holiday Inn.  We got an extension on the franchise agreement. . . .  We extended it for a month with the understanding that when we were going to open [in] July . . . that we would have a sign then.

(Smith Dep. 18:19-20:14.)

On May 31, 2007, Grayling executed a contract with Persona, Inc., evidently RWI's preferred vendor, to secure a lease for the new Ramada signage.  (*See* Workman Aff. Exh. I.) Smith testified that on July 10, 2007, the day of the switchover to Ramada, "I expected the sign company to be there that morning . . . so we wouldn't have a blank sign. . . .  I made no other arrangements for any signage of any type."  (*Id.* 25:22-26:9.)  Nevertheless, "the first day came and went.  No one showed up.  I made a phone call to Brian [Waalkes].  I may have even called Persona that day to find out where our sign was, at which time I found out there was a separate

document of some type from a leasing company" that needed to be signed. "First time I had heard it." (*Id*. 15:15-22.)  This instruction prompted Smith and Ayar to execute a lease agreement between Grayling and CIT Group/Equipment Financing, Inc. ("CIT"), a third-party licensor, whereby Persona, Inc. would provide Grayling with two 11 foot, 9 inch by 18 foot "flexible Ramada face replacements" to be used as signage in front of the Facility.  (Workman Aff. Exh. L.)  An email memorandum shows that as soon as Grayling executed that contract, on July 13, 2007, Carole Lennon, director of brand identity at Wyndham, instructed her subordinate that she had received the signed lease agreement and that the sign should be sent to the Facility when it was ready.  (*Id*. Exh. M.)  Smith testified that the Ramada Inn sign was finally installed sometime in September; however, an invoice signed by a Grayling representative indicates that the signage was installed on August 13, 2007.  (*See* O'Hara Cert. Exh. E.)

According to defendants, there were also problems with the installation of computer hardware and software that Grayling claims it needed to connect with Ramada's central reservation system and e-mail network.  On this subject, the parties do not dispute that Grayling contracted with MICROS, a third-party vendor, on May 18, 2007 (*see* Workman Cert. Exh. O), or that Grayling paid 50% of the purchase price for the computer equipment and software installation in the summer of 2007.  (*See* Smith Dep. 80:9-15.)  In a signed affidavit, Valerie Workman, an executive with RWI, states that Grayling never paid the balance of the money due for the computer equipment.  (Workman Aff. ¶ 53.)  At his deposition, Smith testified that he is "not sure" if Grayling ever paid the amount in full.  (Smith Dep. 85:18-22.)  As of May 15, 2009, his deposition date, Ralph Ayar testified that Grayling still had not paid for the computer system in full.  (Ayar Dep. 89:19-23.)

6

RWI contends that because Grayling contracted with a third-party vendor, it had no obligation to ensure that the computer system was installed.   (*See* Workman Aff. ¶ 51.) Grayling, on the other hand, asserts that RWI was ultimately responsible for the installation based on § 3.6 of the License Agreement, assurances made by RWI at the franchise negotiations, and the fact that it paid RWI for the installation.   Smith testified:   "I sent a $23,000 check to Ramada Inn as a 50 percent down payment on the computer system . . . and I was told that someone from the installation team would call me to set a date up." (*Id.* 78:10-12, 80:22-24.) For the next eight months, according to Smith, RWI's vendor Micros "dropped the ball" and "did not do the install[ation] for one reason or another."   (*Id.* 81:18-24.)    A confirmatory invoice states that the Micros system was finally installed on March 22, 2008.  (*See* Workman Aff. Exh. P.)

Although the Facility was loaded on the Ramada Central Reservation System on July 10, 2007, the day it became a Ramada (*see* Workman Aff. ¶ 34), defendants argue that RWI was obligated to provide "a channel for guests to make reservations through both their central reservation system, as well as access through third-party sites to our website or the Ramada corporate website to make reservations for our hotel." (Smith Dep. 41:4-10.)  Smith testified that the reservation system RWI provided was faulty.  For instance, when the hotel opened in July 2007, "almost immediately" after becoming a Ramada, potential customers that called the toll-free Ramada booking number were told that the Ramada Inn of Grayling did not exist.  (*Id.* 42:16-43:1.)  According to Smith, the problem persisted through the first three to four months after the transition.  (*Id.* 43:3-5.)

Additionally, third-party reservation systems were not functioning as defendants expected.  Smith explained the significance of third-party reservation systems:

7

> Hotels rely on . . . the availability and accessibility from what are called third-party vendor sites, such as Expedia Hotels.com, travel agencies. . . . They do it with Holiday Inn, all the major hotel companies. . . . We did not have that accessibility, and I wasn't aware of it. We were on the Ramada site, but we had no room availability through any of those sites until sometime after the end of August of '07.

(*Id.* 46:12-47:4.)

In response to customers' complaints that third-party sites displayed the Facility as having no availability, Smith contacted Bill Carr, an RWI corporate representative. (*Id.* 47:6-10.) According to Smith, Carr told him at the beginning of August 2007, "'[O]h. That's normal. That happens all the time. It will – it will come around.'" (*Id.* 47:10-13.) After receiving no further response by the end of August, Smith testified that he contacted other RWI representatives who eventually informed him that "'there was a form that was not submitted when you were opened as a Ramada Inn. We've now taken care of it. You're all set now.'" (*Id.* 48:2-4.) Smith stated that the third-party vendors finally showed the Facility as having availability in the middle of October 2007, approximately three months after it opened as a Ramada Inn. (*Id.* 48:16-19.)

In a June 29, 2007 letter with the subject line reading, "Conversion of Holiday Inn to Ramada Inn 20111 in Grayling, MI," RWI senior manager Curt Horner advised Ralph Ayar of what to expect with the impending transition to the Ramada franchise. The letter states, in relevant part, "Your property information will be sent to all the Global Distribution Systems and third party travel sites, such as Travelocity, Orbitz, etc. *The turnaround time to be loaded on these external systems will be between 30 to 120 days.*" (Workman Aff. Exh. G) (emphasis added.) The copy of the letter before the Court contains Smith's signature acknowledging receipt on June 30, 2007, 11 days before the transition date. (*Id.*) RWI eventually suspended the

Facility from the RWI reservation system on March 27, 2008, due to its failure to cure its monetary defaults under the License Agreement. (Workman Aff. ¶ 37.)

Next, defendants contend that RWI breached its obligation under the License Agreement to provide training. Smith testified that until Carr visited the property in mid- to late-August, not one RWI representative had been to the Facility since the transition, even though Smith "needed help with a number of items." (*Id.* 68:7-22.) Belying this contention, however, is Ayar's testimony wherein he stated that RWI representatives did indeed go to the Facility to train Grayling employees. (Ayar Dep. 84:7-85:4.) Additionally, by way of affidavit, Valerie Capers Workman, vice president of franchise administration for RWI, attests that RWI representatives visited the Facility on June 11, 2008, July 23, 2007, August 20, 2007, March 24, 2008, and August 12, 2008, to provide training to Grayling employees. (Workman Aff. ¶ 47.)

Beginning in or about November 2007, Grayling failed to pay Recurring Fees in a timely manner. (*See* Defs.' L. Civ. R. 56.1 Statement of Undisputed Facts ¶ 27.) It is undisputed that Grayling has not made a payment toward the Recurring Fees since August 18, 2008. (Workman Aff. Exh. F.) In an undated letter written by Smith to Ian Raymer, an RWI representative, Smith outlined what he perceived to be RWI's defaults in its obligations to Grayling. (*See* Defs.' Opp. Exh. 10.) He attributed these purported defaults to causing occupancy rates at the Facility to drop from approximately 50%, when it was a Holiday Inn, to 28%, after it became a Ramada Inn. (*Id.*) Accordingly, Smith advised RWI that "we are finding it difficult to even pay our franchise fees, not to mention normal operating costs." (*Id.*) Through letters dated July 8, 2008, October 17, 2008, and June 1, 2009, RWI notified defendants of their defaults under the License Agreement and of its intention to terminate the License Agreement if the defaults were not cured. (Workman Aff. Exhs. C–E.)

9

In a complaint filed July 31, 2008, RWI claims in Count II that Grayling owed it $92,512.08 in past due Recurring Fees, plus interest, attorneys' fees, and costs pursuant to §§ 7 and 18 and Schedule C the License Agreement.  (Compl. ¶ 28.)  In Count I, RWI also claims that Grayling violated §§ 3.8 and 4.8 of the License Agreement because it failed to allow RWI's auditors to examine, audit or inspect Grayling's financial information.  (*Id.* ¶ 23.)  Count VI seeks an unspecified amount of damages from Ralph and Zuhair Ayar for the alleged default of Grayling's obligations to pay Recurring Fees under the License Agreement, pursuant to the terms of the Guaranty.  (*Id.* ¶¶ 39-40.)  Counts III, IV, and V seek identical relief as the claims detailed above based on theories of unjust enrichment and common law breach of contract.  RWI has not moved for summary judgment on these claims at this juncture because the relief it seeks can be satisfied if the Court grants summary judgment on Counts I, II, and VI.

In response to the complaint, defendants filed a counterclaim against RWI.  In Count I, defendants allege that RWI breached its contract by failing to provide Grayling signage, computer system installation, training, and a functioning reservation system.   In Count II, defendants seek rescission of the contract because, when they entered into the agreement, they justifiably relied upon RWI's misrepresentations that Grayling would have signage and computer and reservation systems installed when it was slated to open as a Ramada Inn.  Defendants allege that had RWI disclosed its true intentions that it would not deliver on these representations, they would have instead remained a Holiday Inn.   In Count III, defendants claim that they were fraudulently induced to enter into the License Agreement and Guaranty because RWI representatives assured that there was a strong market for Ramada customers in the Grayling area and that RWI would provide Grayling the aforementioned services.  (Counterclaim ¶ 22.)

This opinion addresses RWI's motion for partial summary judgment on Counts I, II, and VI of the complaint and summary judgment against defendants' counterclaim in its entirety. On this motion, the record consists of a copy of the license agreement executed by RWI and Grayling; an invoice directed to RWI from Persona Inc. relating to installation of signage at the Facility; a copy of the Guaranty entered into by Ralph and Zuhair Ayar; confirmatory performance invoices from CIT and MICROS; three "notice of monetary default" letters from RWI to defendants; various internal Wyndham/RWI email communications; the email communication from Dean Smith to RWI representative Ian Raymer; the letter from RWI to Ayar regarding the July 10 transition; and the depositions of Ralph Ayar, Smith, and Raymer.

The parties agree that New Jersey law governs this action due to the choice of law provision in § 17.6.1 of the License Agreement.

### III.    Standard of Review

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure ("FRCP"), "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The Court must "view the facts in the light most favorable to the non-moving party and [must] draw all inferences in that party's favor." *Gray v. York Newspapers*, 957 F.2d 1070, 1078 (3d Cir. 1992). The Court should deny summary judgment if there is evidence sufficient to allow a reasonable jury to return a verdict for the non-moving party or if the factual dispute is one which might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant's burden, however, "may be discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Additionally, the non-movant "may not rest upon mere allegations or denials of the . . . pleading"; instead, the non-movant, "by affidavits or as otherwise provided in [FRCP 56], must set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV. Discussion

RWI's position on this motion is simple—Grayling's failure to pay the Recurring Fees breached §§ 7 and 18 and Schedule C of the License Agreement. It is undisputed that on May 9, 2007, Ralph Ayar and representatives from RWI executed the License Agreement for the operation of the Facility (*see* License Agreement) and that Grayling ceased paying Recurring Fees on August 21, 2008. (*See* Defs.' L. Civ. R. 56.1 Counterstatement of Undisputed Facts ¶ 34.) Thus, RWI asserts that there is no genuine issue of material fact as to whether Grayling defaulted on the License Agreement.

Defendants, on the other hand, contend that Grayling was absolved from its obligation to pay Recurring Fees under the License Agreement because it was rendered void either by RWI's fraudulent inducement or because RWI materially breached the contract first. They thus argue that who breached the contract first will decide liability. (Defs.' Br. 10.)

Before considering the merits of RWI's motion, the Court must determine the admissibility of certain evidence into the record for review. Specifically, the Court must decide whether it may consider evidence of the parties' oral or written communications contemporaneous or prior to executing the License Agreement, when the parol evidence rule prohibits the introduction of oral promises to alter or vary an integrated written instrument. *Filmlife, Inc. v. Mal "Z" Ena, Inc.*, 251 N.J. Super. 570, 572 (App. Div. 1991). Although New Jersey courts have carved out an exception to the parol evidence rule where oral communications

12

would constitute proof of fraud in the inducement, *see id.*, where, as here, the alleged representations relate to "matters expressly addressed in the integrated writing" the exception does not apply.  *Id.* at 574.   In §§ 17.7.2 and § 17.7.3, the License Agreement explicitly states in bold print that the writing is wholly-integrated.  The provisions also disclaim any oral or written promise or representation not included in the contract.  Here, due to the arm's-length negotiation and execution of the License Agreement between RWI and the Ayars, who are experienced hotel operators in their own right, its provisions govern. The Court thus finds that the parol evidence exception for fraud claims does not apply to any oral communications made at any of the franchise agreement negotiations.  Such evidence is inadmissible on this FRCP 56(c) motion, and will not be considered in determining each party's obligations under their contract.

Defendants also rely on the affidavit of Ralph Ayar to support their position that Grayling materially breached the License Agreement.  With respect to a non-moving party's reliance on affidavits to defeat summary judgment, the Third Circuit has held that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.  Instead, the affiant must set forth specific facts that reveal a genuine issue of material fact."  *Perez v. New Jersey Transit Corp.*, 2009 WL 2461079, at *1 (3d Cir. 2009).  In *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007), the Third Circuit articulated the "sham affidavit rule" and defined a "sham affidavit" as a "contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."  *Id.*  It held that a "sham affidavit cannot raise a genuine issue of material fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant."  *Id.*  The Third Circuit further held in *Jiminez* that "an affiant has the opportunity to offer a satisfactory explanation for the conflict between the

prior deposition and the affidavit." But where the party does not explain the reason for the contradiction, it is appropriate for the district court to disregard the affidavit as a "sham" and not view it as an impediment to granting summary judgment. *Id.*

Here, Ayar created his affidavit, included as Exhibit 4 to defendants' brief, after RWI moved for summary judgment. The information contained in the affidavit directly contradicts Ayar's deposition testimony from three months prior. For instance, at his deposition he testified that RWI representatives went to the Facility to train Grayling employees (Ayar Dep. 84:7-85:4); whereas, in his affidavit he swore that "no Hotel employee received any training or had any other significant contact with Ramada representatives before the July 10, 2007 opening." (Ayar Aff. ¶ 22.) Ayar's deposition testimony and sworn affidavit also directly conflict on the crucial fact of whether he ever reviewed the License Agreement. In paragraphs 15 and 16 of his affidavit, Ayar states:

> [O]n the date the contracts were executed, May 9, 2007, I sat with representatives of Ramada while the Ramada representatives reviewed each of the documents with myself and Dean Smith, explaining the provisions and satisfying me as to the issues of signage, computer hardware and software, training, internet listing on the Ramada system and third party systems.
>
> After review I executed the License Agreement on behalf of Hotel and a representative of Ramda [sic] Worldwide, Inc. executed the License Agreement as well.

When asked at his deposition whether he reviewed the License Agreement, Ayar contradicted his subsequent attestation by testifying as follows:

> Q: Did you ever, after you executed the license agreement, go back and read any specific provision of the license agreement?
> A: I – I did not.
> Q: So, to this day, presently, you've never read any part of the –

14

> A: No.
> Q: -- license agreement?
> A:  No.

(Ayar Dep. 42:12-21.)

Based on these stark inconsistencies, for which defendants do not proffer an explanation, the Court applies the "sham affidavit rule" and will not consider the affidavit submitted by Ralph Ayar on this motion.

## A.  RWI's Motion for Summary Judgment on Counts I and II of the Complaint

Under New Jersey law, if the terms of a contract unambiguous, the Court must construe their meaning as a matter of law for summary judgment purposes.  *J.I. Hass Co., Inc. v. Gilbane Bldg. Co.*, 881 F.2d 89 (3d Cir. 1989).  A review of the relevant portions of the License Agreement, which are set forth in detail *infra*, leads the Court to conclude that its language is not ambiguous.  Moreover, defendants do not raise this issue.  The Court will interpret the contract as written, and will determine the rights or obligations due under it.  *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994).

Under settled franchise law, "[u]nder no circumstances may the non-breaching party stop performance **and** continue to take advantage of the contract's benefits."  *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992) (emphasis in original).  Similarly, in *McDonald's Corp. v. Robert A. Makin*, *Inc.* 653 F. Supp. 401, 403 (W.D.N.Y. 1986), a district court rejected arguments similar to those proffered by defendants here and held that the "alleged wrongs of plaintiff do not constitute affirmative defenses to Defendants' non-payment of franchise fees."

In *Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc.*, 357 F.Supp.2d 788 (D.N.J. 2005) (Greenaway, J.), a case which neither party cites in their respective briefs, Honeysuckle sets forth the identical arguments for non-payment of recurring fees that defendants have here.

15

Although the circumstances of *Travelodge* are similar to the instant matter, the Court finds the case distinguishable.  First, in *Travelodge*, the franchisee, Honeysuckle, terminated its contract with Travelodge for non-performance *before* Travelodge sued to recover unpaid recurring fees.  *Id.*  Honeysuckle's affirmative step solidifies its position in arguing that Travelodge breached their contract and renders *S&R Corp. v. Jiffy Lube*, 968 F.2d at 376, inapposite.  Unlike *S&R*, Honeysuckle did not impermissibly seek to retain benefits under the franchise agreement while not paying fees it owes.  Further distinguishing *Travelodge* from this matter, Judge Greenaway denied summary judgment because he found it instrumental that Travelodge's representatives gave Honeysuckle specific assurances on revenue figures that it would generate if it were to purchase a franchise system, which were not contemplated by the applicable franchise agreement terms, and thus not barred by the parol evidence rule.

Here, unlike *Honeysuckle*, defendants' excuse for not paying Recurring Fees under the License Agreement is barred by the principle of law set forth in *S&R*.  While it argues that RWI denied them the services they were entitled under the License Agreement since the first day of the transition, the Facility continued to use the Ramada mark and franchise system.  Grayling did not terminate the License Agreement and continued to receive the benefits of its franchise agreement without paying for them.  In sum, defendants' arguments regarding RWI's purported breach of contract do not create a genuine issue of material fact to defeat summary judgment on RWI's claims under the License Agreement.   Accordingly, summary judgment is proper on Counts I and II.

### B.  Count VI of the Complaint

RWI also moves for summary judgment on Count VI of its complaint, which relates to the Ayars' alleged default on their guaranty.  For a judgment on a guaranty, a plaintiff must

16

demonstrate six elements:  (1) execution of the guaranty by the guarantor, i.e., that the defendant signed the guaranty; (2) the principal obligation and terms of the guaranty; (3) the lender's reliance on the guaranty in extending monies to the borrower; (4) default by the principal obligator; (5) written demand for payment on the guaranty; and (6) failure of the guarantor to pay upon written demand.  *See U.S. on Behalf of Small Business Admin. v. DelGuercio*, 818 F.Supp. 725, 727–28 (D.N.J. 1993).

Here, RWI has shown as a matter of law that Grayling breached its contractual obligations under the License Agreement by failing to pay its Recurring Fees.  With this showing of default by Grayling, the principal obligator, RWI still must  demonstrate the remaining elements.  First, it is undisputed that Zuhair and Ralph Ayar executed the Guaranty.  (*See* Ayar Dep. 37:4-21.)  Second, as stated in the Guaranty itself, appended to the Workman Affidavit as Exhibit B, the Ayars were required to "immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement." This language is not susceptible to differing interpretation; therefore there is no ambiguity that would preclude summary judgment.  *See American Cyanamid v. Fermenta Animal Health Co.*, 54 F.3d 177, 181 (3d Cir. 1995).   Third, under its express terms, the Guaranty required a third-party to ensure that the principal's obligations will be punctually paid and performed.   The Court finds that the document itself sufficiently demonstrates RWI's reliance on the instrument before providing its services to Grayling.  Next, by letters sent on July 8, 2008, October 17, 2008, and June 1, 2009, RWI notified Grayling of its defaults under the License Agreement. (Workman Aff. ¶¶ 28-30; Exhs. C-E.)   The Ayars were thus sufficiently provided written demand for payment.  Finally, it is undisputed that the Ayars have failed to remit payment of the Recurring Fees due under the License Agreement.

Based on the foregoing, RWI has met its burden of establishing a breach on the Guaranty and defendants have not shown that there are any issues of material fact.  Summary judgment is also appropriate in Count VI.

### C.  Summary Judgment as to Defendants' Counterclaims

#### 1.  Breach of Contract by RWI

Although the Court has determined that defendants owe Recurring Fees under the License Agreement, their counterclaim for breach of contract by RWI still remains. Defendants proffer that RWI committed four material breaches by foregoing its obligations to: (1) provide signage; (2) install a computer and software management system; (3) place the Facility on reservation system websites; and (4) provide training.  (Defs.' Br. 11.)

#### a.  Signage

Defendants contend that pursuant to § 3.12 of the License Agreement, which states in part, "[y]ou must lease your exterior signage face plates from our approved leasing company," Grayling could only obtain exterior signage from a company approved by RWI.  Thus, they submit, the signage issue was within the control and direction of RWI.  Although defnednats seek to rely on Ayar and Smith's testimony that RWI made representations regarding signage before they executed the License Agreement, this evidence is barred as parol evidence.

In support of its motion, RWI points out that the terms of the License Agreement do not require it to provide signage.  Defendants do not dispute this key fact.

Smith testified that *after* the parties entered into the License Agreement, and thus admissible on this motion, RWI informed Grayling that a sign could not be installed by the date on which the Facility was first slated to become a Ramada Inn.  (Smith Dep. 18:19-19:15.) Based on this, Grayling extended its franchise agreement with Holiday Inn for another month,

18

"with the understanding that when we were going to open [in] July . . . that we would have a sign then." (*Id.* 20:12-14.)  On May 31, 2007, Grayling executed a contract with Persona, Inc. for the purpose of procuring the signage.  (*See* O'Hare Cert. Exh. I.)  On July 11, 2007, the Facility became a Ramada Inn and there was still no signage installed.   On that same day, Grayling finally executed a lease agreement with the CIT Group to finalize the procurement of the signage (*see* O'Hare Cert., Exh. K), but the parties dispute when and how Grayling came to learn of the necessary step of executing a contract with yet another company.  Ayar testified that they called RWI on the transition date, "We were looking for the sign, and we told them that, where's – where's the sign?"  According to Ayar, that was when they first sent the lease agreement to defendants.  (Ayar Dep. 76:14-20.)

To the contrary, RWI proffers that it clarified any ambiguity in what was necessary to secure signage nearly a month earlier on June 14, 2007, when it forwarded an email to Smith. The email states "Your CIT Equipment Financing legal documents have been prepared and are ready for you to print and sign."  (O'Hare Cert., Exh. K.)  Defendants do not address this email in their brief other than a reference to the naked assertion in paragraph 25 of the "sham" Ayar Affidavit, which states that "no Hotel representative had received the e-mail allegedly sent on June 14th 2007 concerning CIT group."

As stated, under the terms of the License Agreement, the parties do not dispute that RWI was not required to provide signage.  Accordingly, on this issue, irrespective of any subsequent promises, the Court rejects defendants' argument that RWI materially breached the terms of the License Agreement by failing to secure signage for the Facility.  Further, the Court finds that by sending the email, on which defendants adduce no admissible evidence to create a factual

dispute, RWI properly attempted to clear up any ambiguity on the Grayling's obligations to contact CIT.

### b.  Computer and Software Management System

Similar to the signage issue, the parties disagree about RWI's obligations to provide Grayling with a computer and software management system.  Grayling contends that when it paid 50% of the purchase price in June 2007 for the hardware, software installation and related training, RWI was required to ensure that its vendor fulfilled the contract. On this claim, defendants do not identify which provision of the License Agreement RWI breached.

In response, RWI argues that it made no representations or assurances regarding the computer system.  It contends that the contract executed by Grayling and Micros does not impose any obligations on it.   RWI points out that Grayling sought on its own to upgrade its computer equipment and software with MICROS, even though its old computer system allowed it to access RWI's reservation system.  (Smith Dep. 57:10-59:13.)  As of May 2009, Grayling still had not paid for the equipment in full.  (Ayar Dep. 89:19-23.)  Moreover, as Smith testified, it was Micros that "dropped the ball" and "did not do the install for one reason or another." (Smith Dep. 81:18-24.)   The Court finds that defendants have not established how RWI materially breached the License Agreement as they identify no breached provision of the contract and any unexcused delay in installing the computer they attribute to MICROS, not RWI.

### c.  Reservation Systems

Section 4.2 of the License Agreement obligates RWI to "operate and maintain . . . a computerized Reservation System or such technological substitute(s) as we determine in our discretion."  (*See* License Agreement, § 4.2.)  In her affidavit, Workman attests that the Facility was loaded onto the RWI reservation system on July 10, 2007, the Facility's opening day as a

20

Ramada franchise.  (Workman Aff. ¶ 34.)  Accordingly, RWI argues that it met its obligations under the License Agreement.

Irrespective of this fact, defendants contend that RWI breached its obligations to maintain reservation systems because they did not place the Facility on third-party websites like Expedia and Hotels.com for two months. (Smith Dep. 56:12-57:4.)  According to Smith, the two months without customers' ability to make reservations online caused Grayling to fall behind financially. (*Id*. 70:4-24.)  The Court finds defendants' argument unavailing because Ralph Ayar and Dean Smith had advance notice of the amount of time it would take for RWI to have the Facility placed on third party websites.  In the June 29, 2007 letter, Grayling was specifically advised that "[t]he turnaround time to be loaded on these external systems will be between 30 to 120 days." (Workman Aff. Exh. G.)   It is undisputed that the Facility was placed on these third-party websites within that time frame.  Accordingly, in addition to finding that RWI met its bare obligations under § 4.2 by placing the Facility on the reservation system, the Court rejects defendants' argument that RWI breached any subsequent assurance when it failed to place the Facility on a third-party for two months.

### d.  Training

Defendants also argue that RWI's failure to adequately train its staff, as it was required under §§ 4.1 and 4.7 of the License Agreement, materially breach the franchise agreement.  In support of their claim, defendants reference the Ayar Affidavit which avers that "[a]fter July 10, 2007, no training . . . took place.  (Ayar Aff. ¶ 22.)  Other than this reference to what the Court considers a "sham" affidavit, defendants have not supported their allegation with any evidence. On the contrary to this assertion, Ayar and Smith admitted at their respective depositions that they attended training events sponsored by RWI in May, July, and October 2007.  (Ayar Dep.

84:24-86:25; Smith Dep. 86:9-88:15.)   Additionally, Ayar and Smith admitted at their depositions that RWI provided training at the Facility on separate occasions.   (*See* Ayar Dep. 84:7-23, 99:12-100:2; Smith Dep. 88:21-89:5.)  By way of affidavit, Valerie Capers Workman, vice president of franchise administration for RWI, attests that RWI representatives visited the Facility on June 11, 2008, July 23, 2007, August 20, 2007, March 24, 2008, and August 12, 2008, to provide training to Grayling employees.  (Workman Aff. ¶ 47.)  In light of the dearth of evidence adduced by defendants, further contradicted by their own contradictory testimony, the Court determines as a matter of law that defendants have failed to create a genuine issue of material fact on whether RWI materially breached the License Agreement with respect to the provision of training.

### 2.   Fraudulent Inducement

To establish a counterclaim of fraudulent inducement, defendants must show that RWI made a misrepresentation of a material fact, *which was false and known to be false when made*, for the purpose of inducing another party to actually and reasonably rely on it, resulting in harm. *See Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir. 1993) (emphasis added). "Although a promise to do something in the future will not normally suffice . . . [w]here a promise is given and the promisor knows at the time of promising that he has no intention of fulfilling it, the promise will constitute a misstatement of present fact and may support an allegation of fraud." *See Travelodge*, 357 F.Supp.2d at 796–97.

Although defendants argue that RWI representatives gave assurances at the License Agreement negotiations about having signage and a computer system in place on the day of the transition (Defs.' Opp. 24), the parol evidence rule prohibits introduction of this evidence to contradict the wholly-integrated License Agreement, which does not impose any such

22

obligations on RWI.  Instead, the License Agreement is explicit that any oral representations not provided for in the terms of the instrument are disclaimed and superseded.  (*See* License Agreement §§ 17.7.2, 17.7.3.)  Moreover, in the admissible evidence defendants have adduced, there is no indication that RWI, through its representatives, knew on the execution date that it did not intend to fulfill those promises.  Defendants have failed to create a material issue of fact on its counterclaim for fraud in the inducement and summary judgment is appropriate.

**V.      Conclusion**

RWI's motion for summary judgment [D.E. 31] with respect to Counts I, II, and VI of its complaint is **granted**.  RWI's motion for summary judgment in its favor on defendants' counterclaims is **granted**.  An appropriate order will be entered.


/s/Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.


23